UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| VICTORIA L. TOLER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CAUSE NO.: 1:04-CV-255-TS |
| | ) |
| LOWE'S HOME CENTERS, INC., | ) |
| | ) |
| Defendant. | ) |

## OPINION AND ORDER

The Plaintiff, Victoria L. Toler, was employed by the Defendant, Lowe's Home Centers, Inc., for almost four years. During her third year, the Defendant passed her up for a promotion and eventually fired her. Believing that the Defendant's refusal to promote her constituted sex discrimination and that the firing was in retaliation for her threatening to file discrimination charges with the EEOC, the Plaintiff sued the Defendant in this Court under Title VII of the Civil Rights Act of 1964.

The Defendant moved for summary judgment, which the Plaintiff is opposing. Accordingly, the Court must decide whether any genuine issues of fact exist that preclude the resolution of this case without a trial.

### DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**A. Summary Judgment Standard**

The Federal Rules of Civil Procedure mandate that motions for summary judgment be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together

with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "In other words, the record must reveal that no reasonable jury could find for the nonmoving party." *Dempsey v. Atchison, Topeka, & Santa Fe Ry. Co.*, 16 F.3d 832, 836 (7th Cir. 1994) (citations and quotation marks omitted). Rule 56(c) further requires the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A party seeking summary judgment bears the initial responsibility of informing a court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. The moving party may discharge its "initial responsibility" by simply "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the non-moving party's case." *Id.* at 325. When the non-moving party would have the burden of proof at trial, the moving party is not required to support its motion with affidavits or other similar materials negating the opponent's claim. *Id.* at 323, 325; *Green v. Whiteco Indus., Inc.*, 17 F.3d 199, 201 n.3 (7th Cir. 1994); *Fitzpatrick v. Catholic Bishop of Chicago*, 916 F.2d 1254, 1256 (7th Cir. 1990). However, the moving party may, if it chooses, support its motion for summary judgment with affidavits or other materials and thereby shift to the non-moving party the burden of showing that an issue of material fact exists. *Kaszuk v. Bakery & Confectionery Union & Indus. Int'l Pension Fund*, 791 F.2d 548, 558 (7th Cir. 1986); *Bowers v. DeVito*, 686 F.2d 616, 617 (7th Cir. 1982); *Faulkner v. Baldwin*

*Piano & Organ Co.*, 561 F.2d 677, 683 (7th Cir. 1977).

Once a properly supported motion for summary judgment is made, the non-moving party cannot resist the motion and withstand summary judgment by merely resting on its pleadings. Fed. R. Civ. P. 56(e); *Donovan v. City of Milwaukee*, 17 F.3d 944, 947 (7th Cir. 1994). Federal Rule of Civil Procedure 56(e) establishes that "the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts to establish that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see also Anderson v. Liberty Lobby*, 477 U.S. 242, 248–50 (1986). Thus, to demonstrate a genuine issue of fact, the non-moving party must do more than raise some metaphysical doubt as to the material facts; the non-moving party must come forward with specific facts showing that there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Juarez v. Ameritech Mobile Communications, Inc.*, 957 F.2d 317, 322 (7th Cir. 1992). Conclusory allegations and self-serving affidavits, if not supported by the record, will not preclude summary judgment. *Haywood v. N. Am. Van Lines, Inc.*, 121 F.3d 1066, 1071 (7th Cir. 1997).

In viewing the facts presented on a motion for summary judgment, a court must construe all facts in a light most favorable to the non-moving party and draw all legitimate inferences and resolve all doubts in favor of that party. *NLFC, Inc. v. Devcom Mid-Am., Inc.*, 45 F.3d 231, 234 (7th Cir. 1995); *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir. 1994); *Beraha v. Baxter Health Care Corp.*, 956 F.2d 1436, 1440 (7th Cir. 1992). A court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *Anderson*, 477 U.S. at 249–50; *Doe*, 42 F.3d at 443.

**B. Material Facts**

**(1)** *Background*

Resolving all genuine disputes and drawing all reasonable inferences in the Plaintiff's favor, the facts assumed to be true for the purposes of ruling on the Defendant's Motion for Summary Judgment are as follows:

The Defendant owns and operates a chain of retail home improvement stores, including a store in Fort Wayne, Indiana, on Illinois road, where the Plaintiff was employed from January 2000 until October 20, 2003.

The Defendant's employees generally receive a paid break for every four hours worked and an unpaid meal break when they work more than five hours a day. These breaks may be delayed or shortened as a result of operating requirements or customer needs.

The Defendant maintains an employee purchase discount policy that allows them to buy its goods at 10% savings. Also, sometimes the employees may buy "prepackaged" goods. Such purchases involve buying grouped merchandise—for example, a collection of outdoor plants after the first frost or items that have been discontinued or cannot be sold—at a price much lower than the retail price. The Store Manager or an Assistant Store Manager must approve a prepackaged purchase. Abuse or violation of employee purchase privileges may result in discipline and even termination.

The Plaintiff began working as a Head Cashier at the Defendant's Fort Wayne store in January 2000. At that time, she received the new employee's orientation guide, which contained its policies, programs, and procedures. Around August 2001, the Plaintiff was promoted to Assistant Department Manager in the Outside Lawn and Garden Department. With this promotion, she

received a pay increase. But after two months at her new position, she requested to be demoted to Customer Service Associate because she felt that the Department Manager's position required too many hours for the pay she was receiving. The Plaintiff's request was granted and she remained a Customer Service Associate until her termination on October 20, 2003.

**(2)** *Team Leader's Position*

Around July 2003, the Plaintiff told Matt Martel, her then Department Manager, that she was interested in a Team Leader's position in the Outside Lawn and Garden Department. She also told this to the Store Manager Terry Brimhall.

In August and September 2003, the Plaintiff was counseled by her superiors three times about taking breaks with coworker Michael Stallings and leaving her work area unstaffed. When she and Stallings took their breaks together, no one was covering the department and, if the customers needed help, they had no one to consult. This was contrary to the Defendant's "customers first" philosophy. The first time she was counseled by the Assistant Store Manager Jacob Johnson. Despite the counseling, a week later, the Plaintiff and Stallings did the same thing again. Johnson then counseled them for the second time and warned them that they would be written up if this happens again. Nevertheless, shortly thereafter, the pair had to be counseled once more by Clint Roth, their Department Manager.

At some point before September 13, Martel recommended to Brimhall that the Plaintiff should be appointed a Team Leader because she had requisite knowledge and experience for the job. However, Johnson recommended Starnes, a newly hired employee,[1] rather than the Plaintiff

---

[1] Starnes had worked for the Defendant at its Fort Wayne store before and had also worked at its store in Bloomington, Indiana, but had never worked in the Outside Lawn and Garden department.

5

because, after the repeated lunch break incidents, he had no confidence that he could count on her if he or the department manager were absent.[2] Also, he felt that she had not given him full support in running the department. On the other hand, Starnes, who appeared to be just as qualified, had not presented him with any problems. On September 13, following Johnson's recommendation, Brimhall promoted Starnes as a Team Leader.

**(2) *Plaintiff's Threat to File Sex Discrimination Charges***

After learning that Starnes took the Team Leader's position, the Plaintiff told Martel that she intended to file sexual discrimination charges against Brimhall. A week later, she told the same thing to Roth. Around the same time, the Plaintiff spoke with Brimhall about being passed over for the Team Leader's position. Brimhall offered her such position in a different department, but the Plaintiff refused, telling him that she only wanted to work in the Lawn and Garden department. Meanwhile, the Plaintiff kept working as a Customer Service Associate.

**(3) *Prepackaged Plant Purchase and Termination***

On October 5, the Plaintiff sought to buy some prepackaged plants. She picked out some plants that she wanted to buy at a significant discount. Stallings, Outside Lawn and Garden Specialist, told her that she could have them for $30. However, when Roth, the Department Manager, learned about her plans to buy the plants, he told her that she needed an approval for the sale from the Store Manager or an Assistant Store Manager because Stallings had no authority to approve the sale. The Plaintiff then went to Johnson, an Assistant Store Manager, who told her that

---

[2]Clint Roth, who worked with Starnes in the past, also recommended him to Brimhall as a very good worker and a person who is great with customers.

6

he had to inspect the plants before he could approve the purchase. However, Johnson did not have an opportunity to inspect the plants and the Plaintiff did not hear back from him.

After Johnson, the Plaintiff called Christopher Kueser, another Assistant Store Manager, who had already heard that the Plaintiff was attempting to buy some plants at a prepackaged price. Kueser had inspected the plants and thought that they were perfectly fine. He suspected that, by requesting a significantly discounted sale on the plants, the Plaintiff was attempting to steal from the company. Kueser had asked Todd, the loss prevention specialist, to inspect the plants with him.

When the Plaintiff called him, Kueser wanted to see if she would go through with the purchase. The Plaintiff told him that she wanted to get an approval for a prepackaged purchase of the plants and that she had already attempted to get the approval from Johnson, who did not have an opportunity to inspect the plants. She also told him about her conversation with Roth and Stallings. Kueser asked her if those plants were on clearance and she told him that they were not, but that they were damaged plants. She asked him if he wanted to come and look at the plants but he declined. Kueser then told her to have the head cashier complete the sale.[3] Kueser did not tell the Plaintiff that he thought the purchase price was inappropriate.

After this conversation, the Plaintiff wrote down the plant numbers and went to Chanelle Barnes, the Head Cashier. She told Barnes that she was going to buy prepackaged plants for $30, and Barnes asked her if she should call Kueser for the approval. The Plaintiff answered that she had already spoken with him. Barnes processed the sale, and the Plaintiff took the plants to her son's house.

---

[3]The Head Cashiers do not have the authority to mark down merchandise without the management's approval. However, they may override a sale through a "call and unlock," and complete the purchase at price set by a manager.

The next day, the loss prevention department began reviewing the Plaintiff's purchase. On October 17, Shawn Hanley, Loss Prevention Manager, and Kimberly Arnett, Personnel Training Coordinator, interviewed her. During this meeting, at the direction of Hanley, the Plaintiff wrote out a statement concerning her plant purchase. Among other things, she stated:

> The markdown was by myself and prepackage was done by myself. I spoke to [Roth, Jacobson, and Kueser] and they did not come to look at the product. I asked [Kueser] if it was OK it was damaged and he told me to have a head cashier to approve it. . . . I realize that what I did was a loss to the company and I will return the product. Everything I have written is made in my free will and no threats and promises were made. I was treated professionally. This is a regular occurrence of markdowns by other people.

Def's Ex. K.

On October 20, 2003, Brimhall, the Store Manager, told the Plaintiff that she was being fired for removing the plants from the garden center without management's approval. The Plaintiff told him that she had approval from Kueser, and Brimhall gave her a toll-free number to call if she wanted to appeal the termination.

**C.  Sex Discrimination**

The Plaintiff claims that the Defendant passed her over for a promotion to a Team Leader's position because she is a woman. The Defendant responds that her gender had no effect on its decision to not select her for the position. Instead, she was not selected because, just weeks before the Defendant filled the Team Leader's position, she twice disobeyed her superior's directions not to leave her work area unattended during her breaks.

The Plaintiff does not present any direct evidence of sex discrimination. Rather, she has chosen the *McDonnell Douglas* indirect method to show that the Defendant's failure to promote her was motivated by prohibited animus. Under this approach, she must first establish a *prima facie* case

of sex discrimination. To do that, she "must demonstrate that: (1) she is a member of a protected class; (2) she was performing her job satisfactorily; (3) she suffered an adverse employment action; and (4) at least one similarly situated employee, not in her protected class, was treated more favorably." *Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 978 (7th Cir. 2004).

If she succeeds in establishing the *prima facie* case, the Defendant "can produce evidence of a legitimate nondiscriminatory explanation of its adverse employment action; the employer would then be entitled to summary judgment unless the employee can rebut this explanation with evidence that it is pretextual." *Id* at 978–79.

The Plaintiff is unable to establish a *prima facie* case of sex discrimination. Although she can demonstrate that she is a member of a protected class and that she suffered an adverse employment action,[4] she cannot establish that she was performing her job satisfactorily, so as to be entitled to a promotion as a Team Leader, and that a similarly situated employee, not in her protected class, was treated more favorably.

Sometime in July 2003, the Plaintiff expressed her interest in becoming a Team Leader in the Outside Lawn and Garden department. Only a month later she was twice counseled by Johnson, the person who was to give the recommendation to the Store Manager as to who should be appointed

---

[4] The Defendant argues that the Plaintiff's transfer to a Team Leader's position would have been a lateral transfer and, thus, the failure to transfer did not constitute an adverse employment action. Such claim is contradicted by the evidence in the record: the Defendant's own records state that Starkes was "promoted" to the Team Leader's position. True, while the Plaintiff's pay would have remained the same in the Team Leader's position, she would have had more responsibility and status within the company and would have substituted for the Department Manager when he or she was unavailable. These factors show that the Defendant's refusal to select the Plaintiff for the Team Leader's position constituted an adverse employment action. *See Cole v. Greater Clark County Schs.,* 2004 WL 350446, *10 (S.D. Ind.) (S.D. Ind. 2004) ("[A] promotion may also occur if, in the position sought, the applicant would assume significantly increased responsibilities or a more distinguished title.") (citing *Hilt-Dyson v. City Of Chicago*, 282 F.3d 456, 465–66 (7th Cir.2002)).

a Team Leader, for leaving her work area unattended. Despite Johnson's admonishments, only a week later, she did the same thing again completely disregarding Johnson's authority. As a result, Johnson recommended Starnes for the Team Leader's position, with whom he had no negative encounters. Johnson was looking for someone who was reliable to provide constant coverage for the Outside Lawn and Garden Department. He did not believe that the Plaintiff, who had disregarded his authority, was fit for the position. Moreover, he felt that the Plaintiff did not give him the full support to carry out his responsibilities in that department. For these reasons, Johnson did not believe that the Plaintiff was qualified to become a Team Leader. Brimhall, in turn, simply followed Johnson's recommendation.

Johnson found the qualifications he wanted for a Team Leader in Starnes. The Plaintiff believes that Starnes is a similarly situated employee who was treated more favorably than she was. To establish that an employee is similarly situated, the Plaintiff must show that "the relevant aspects of [her] employment situation were nearly identical to [her] alleged comparator." *Nunnery v. Elgin, Joliet & Eastern Ry.*, 48 F. Supp. 2d 1122, 1131 (N.D. Ind. 1999) (citations and quotation marks omitted). "Such a showing normally entails establishing that 'the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them.'" *Snipes v. Ill. Dep't. of Corrections*, 291 F.3d 460, 463 (quoting *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617–18 (7th Cir. 2000)); *see also Grayson v. O'Neill*, 308 F.3d 808, 819 (7th Cir. 2002) (to meet his burden the plaintiff must demonstrate that there is someone directly comparable to him in all material respects).

Starnes is not similarly situated to the Plaintiff because, unlike her, he was not counseled for

failing his duties. True, Starnes was hired only ten days before he was made a Team Leader, but Johnson had been observing him and was satisfied with his attitude and work performance. On the other hand, just weeks before Johnson's recommendation as to who should become the Team Leader, the Plaintiff had disregarded his authority by repeating the infractions for which he had previously counseled her. The Plaintiff's insubordination justified the Defendant treating her differently from Starnes because her and Starnes's actions were also different. Since Starnes was not similarly situated to the Plaintiff in how he responded to his superiors, the fourth element of the Plaintiff's *prima facie* case is not met.

As the Plaintiff is unable to establish a *prima facie* case, the Court need not consider her sexual discrimination claim any further. *Simpson v. Borg-Warner Automotive, Inc.*, 196 F.3d 873, 878 (7th Cir. 1999) (where the plaintiff has not established a prima facie case of Title VII sex discrimination, the defendant need not explain its actions under the *McDonnell Douglas* test). Instead, it must enter summary judgment for the Defendant on that claim.

**D. Retaliation**

The Plaintiff alleges that the Defendant fired her because she threatened the management to file sexual discrimination charges the management for not receiving the Team Leader's position. The Defendant responds that her threat had no effect on its decision to terminate her; rather, she was fired for abusing the employees' purchase policy by arranging a sale of prepackaged plants without the management's approval.

As with her sexual discrimination claim, the Plaintiff does not present any direct evidence of retaliation. Here, too, she is using the *McDonnell Douglas* principles to demonstrate the

11

Defendant's wrongdoing.

> [A]n employee is entitled to summary judgment if [she] presents uncontradicted evidence that (1) after lodging a complaint about discrimination, (2) only [she], and not any otherwise similarly situated employee who did not complain, was (3) subjected to an adverse employment action even though (4) [she] was performing [her] job in a satisfactory manner[.] The employer can survive a summary judgment motion by presenting contradictory evidence in response to the employee's prima facie case; the employer is entitled to summary judgment despite the employee's prima facie case [i]f the [employer] presents unrebutted evidence of a noninvidious reason for the adverse action. The reason provided for the adverse action can be good or bad, provided only that it is not one that the law forbids.

*Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 981 (7th Cir. 2004) (quotation marks and citations omitted).

The employee may rebut the employer's noninvidious reason by showing that it is merely a pretext for the prohibited action, such as an "explanation without a basis in fact." *Olsen v. Marshall & Ilsley Corp.*, 267 F.3d 597, 601 (7th Cir. 2001). "Pretext is more than a mistake on the part of the employer; it is a phony excuse." *Hudson v. Chicago Transit Authority*, 375 F.3d 552, 561 (7th Cir. 2004). If pretext is demonstrated, the case must go to trial. *See Olsen*, 267 F.3d at 601 (when an explanation is without a basis in fact, "a reasonable factfinder may infer that (1) the employer is lying about its true motive and, (2) because the employer is in the best position to assert the reason for its decision, that it offered a false one in order to cover up a discriminatory motive."). The plaintiff, however, "bears the ultimate burden of persuasion that the [the defendant's] proffered reason is merely a pretext for discrimination." *Johnson v. West*, 218 F.3d 725, 732 (7th Cir. 2000).

The Plaintiff has established without difficulty the first and third elements of the *prima facie* case of retaliation for exercising her Title VII rights, complaining about discrimination and suffering an adverse employment action: after learning that she was not selected for a Team Leader's position, the Plaintiff told Martel, her former Department Manager, and Roth, her new Department Manager,

12

that she would be filing sexual discrimination charges against Brimhall, the Store Manager; she also spoke to Brimhall and told him that she was very unhappy with not being promoted; about three weeks later, Brimhall told her that she was fired for violating employee purchase policy. However, the second and fourth elements—being treated worse than a similarly situated employee and performing job satisfactorily—are more complex, especially, since they are closely intertwined with the pretext analysis. The Court will consider them together with the Plaintiff's claim that the Defendant's reasons for firing her were pretextual. *See Olsen v. Marshall & Ilsley Corp.*, 267 F.3d 597, 600 (7th Cir. 2001) (where *prima facie* analysis would overlap substantially with the question of pretext, the court may address the two together).

The Defendant maintains that Brimhall fired the Plaintiff for a nondiscriminatory reason: violating employee purchase policy.[5] The Defendant argues that Brimhall honestly believed that she violated the company's policy and that the decision was reached after an independent investigation by the Loss Prevention Department. According to the Defendant, the Plaintiff grouped together some outdoor plants and, contrary to the store's policy, discounted them from $300 to $30 without the Store Manager's or an Assistant Store Manager's approval. The Defendant points out that she wrote out a statement in the presence of Hanley, Loss Prevention Manager, and Arnett, Personnel Training Coordinator, acknowledging that she did the prepackaging and markdown by herself and that she caused loss to the company.

The Plaintiff submits that the Defendant's reason is pretextual because she had approval from Kueser, an Assistant Store Manager, to purchase the plants. She argues that the Defendant could not have honestly believed that she violated its purchase policy.

---

[5]This assertion also goes to the Defendant's claim that the Plaintiff was not performing her job satisfactorily.

13

The Plaintiff has presented enough evidence to cast the shadow of pretext on the Defendant's explanation why Brimhall fired her. The Plaintiff did not attempt to hide her purchase or coax the upper management to inadvertently approve it. Stallings, Outside Lawn and Garden Specialist, told her that she could have the plants for $30. When Roth, her Department Manager, learned of this, he instructed her to get an approval from the Store Manager or an Assistant Store Manager. The Plaintiff followed his directive and contacted Johnson, an Assistant Store Manager. She asked him to approve the purchase but, having not seen the plants, he left the store without authorizing the transaction. The Plaintiff then called Kueser, another Assistant Store Manager, to request his approval of the sale. Kueser asked her if those plants were on clearance and she told him that they were not, but that they were damaged plants. She asked him if he wanted to come and look at the plants, but he declined. Kueser then told her to purchase the plants and to have the head cashier or another assistant manager to approve the purchase.

In light of these facts, Kueser's actions constituted an approval of the sale. The Court is not looking for the magic phrase "I approve" but looks at Kueser's actions as a whole. Even before the Plaintiff called Kueser, he had heard from someone that she was trying to purchase some plants at a prepackaged rate. In fact, he suspected that she was attempting in this way to steal from the company and wanted to see if she would go forward with the purchase. However, when she called him and invited him to inspect the plants, he declined, and told her to go to the head cashier to approve the purchase; he did not tell her that she could not buy the plants or that the price was too low. The Defendant does not explain why Kueser's instruction to go to the cashier, who had no authority on her own to approve the sale, did not constitute an authorization. If Kueser had some mental reservation as he directed the Plaintiff to carry on with the sale, she was not privy to it.

The Plaintiff has consistently claimed that Kueser approved her purchase. Her statement to Hanley does not negate her story. There she wrote: "I spoke to [Roth, Jacobson, and Kueser] and they did not come to look at the product. I asked [Kueser] if it was OK it was damaged and he told me to have a head cashier to approve it." Of course, these two sentences have to be read together with the rest of the statement, where she also said that "[t]he markdown was by myself and prepackage was done by myself" and "what I did was a loss to the company and I will return the product." Yet, the Court is mindful that the Plaintiff wrote the statement with the help of Hanley in return for his promise to tell the company that she cooperated in the investigation. But more important, even if those two sentences are taken at their face value, they do not prove that the Plaintiff did not get permission from Kueser to buy the plants. If anything, they suggest that she, not Kueser, came up with the price for the plants and that the price was too low; but they do not negate Kueser's approval of the sale who told her to go through with the purchase and have the head cashier approve the purchase. If the Plaintiff got too good a deal, it was so only with the fiat of Kueser. Most important, the Defendant does not claim that she was terminated for getting a good deal but for doing so without management's approval.

One other thing obscures the reliability of the Defendant's stated reason for the Plaintiff's termination. In its Reply brief, the Defendant argues that the Loss Prevention department initiated an independent investigation into the Plaintiff's purchase. This assertion is contradicted by Kueser, who stated that, even before the Plaintiff called him, he had asked Todd from Loss Prevention Department to assist him. Thus, the Defendant's claim that Loss Prevention's investigation was independent is less than genuine.[6]

---

[6] The Defendant did not submit any reports by the Loss Prevention Department. It presented only written statements from Roth and Johnson (and the Plaintiff), which they submitted to Loss Prevention.

By proffering a reason for the Plaintiff's termination for which there appears to be no basis in fact, the Defendant has raised an issue of fact as to its true reason for the Plaintiff's termination. It's difficult to conceive how the Defendant could have believed that the Plaintiff did not have the management's approval for her purchase. Morever, since the evidence, considered in the light most favorable to the Plaintiff, shows that she bought the plants with an Assistant Store Manager's approval, the Plaintiff has sufficiently presented a similarly situated person—Michael Stallings—who was treated more favorably than she was. Stallings, who worked in the same department as the Plaintiff, has also purchased prepackaged plants. However, he was not disciplined. Accordingly, the case must go before jury, who will decide whether the Defendant retaliated against her because she threatened to file sex discrimination charges against Brimhall.

## CONCLUSION

The Plaintiff has failed to establish a *prima facie* case of sex discrimination. Accordingly, the Court GRANTS summary judgment for the Defendant on that claim. However, as to the Plaintiff's retaliation claim, the Court DENIES summary judgment.

SO ORDERED on June 27, 2005.

       s/ Theresa L. Springmann
       THERESA L. SPRINGMANN
       UNITED STATES DISTRICT COURT